# The Morning Mail.[1]

### (*District Court, D. Kentucky.* July, 1883.)

1. "Unavoidable Dangers of Navigation"—Loss by Striking Bridge Piers.
   The exception, "unavoidable dangers of navigation," as used in a bill of lading for transportation of goods by river, includes unavoidable dangers of navigation which may arise from bridges across the rivers to be navigated. Under the circumstances of this case, the goods being lost by the boat striking a bridge pier, and the court finding that the boat was properly navigated, *held*, that the loss was within the exception.

2. Detention of Goods until General Average Paid.
   Where there was a privilege of reshipping, and the goods were damaged while in the possession of one of the connecting lines, making a general average necessary, such connecting carrier can hold the goods until the average contribution is paid or secured.

1 Reported by J. C. Harper, Esq., of the Cincinnati bar.

3. SAME—PROXIMATE CAUSE OF LOSS.
  Where a detention takes place by reason of the adjustment of such general
  average contribution, one boat in the connecting line leaving port in the mean
  time, and the goods go forward on the succeeding boat of the line and are lost
  by the boat striking a bridge pier, *held*, that such detention was too remote,
  and not the proximate cause of the loss of the goods.

In Admiralty.

*Collins & Beach*, for libelant.

*Lincoln & Stephens* and *Goodloe & Roberts*, for respondent.

BARR, J.   The libelant, Blatterman, sues to recover the value of goods and household furniture shipped at Maysville, Kentucky, to Kansas City, Missouri, by the Morning Mail, and which were sunk on the Joe Kinney in the Missouri river, at the Glasgow bridge, April 12, 1882.   The bill of lading, which is dated March 16, 1882, agreed to deliver in good order, without delay, at Kansas City, "unavoidable dangers of navigation and fire only excepted."   The Morning Mail was a packet running between Maysville and Cincinnati, and both parties understood the goods were to be reshipped at Cincinnati and St. Louis.   The goods were reshipped at Cincinnati for St. Louis on the Montana, and passing down the Ohio river the Montana met with an accident at the mouth of Louisville canal, which detained her and made the cargo subject to general average.   The Montana arrived at St. Louis, noon, March 25, 1882, and her cargo was there unloaded and the general average ascertained and apportioned.   The libelant's goods remained in St. Louis until the eighth of April, when they were reshipped on the Joe Kinney.   The Fanny Lewis went out on the first of April, but the libelant's goods were not sent on that boat, and were held subject to the claim for general average. The Kinney was the next boat of the packet line, and the average having been, as it was supposed, adjusted, the goods were shipped on her and lost, with the boat, at the bridge at Glasgow.   The libelant's claim based upon this delay I do not think is good.

It is agreed that the goods were properly subjected to the payment of a general average claim, and the proof shows that five days were a reasonable time within which to assort and determine the amounts to be paid by the owners of the cargo.   The shipper was not bound to send the goods on to Kansas City and there hold them until the average claim was paid, but, I think, might hold them at St. Louis, which was the termination of the Montana's voyage. Again, I think this claim cannot be sustained because the sinking of the Kinney was in no way connected with the detention of the goods, and the loss of the goods was not directly caused by their detention. This loss is too remote and indirect to be compensated for as the result of the detention.

The defendant, as common carrier, is liable for the loss occasioned by the sinking of the Kinney, as she gave a through bill of lading, unless the loss was caused by the "unavoidable dangers of navigation."   This means the dangers of navigation as they existed at the

time, and includes, I think, unavoidable dangers of navigation which may arise from bridges across the rivers to be navigated.

The libel alleges that the Morning Mail had the right, by agreement, to reship said goods, etc., at Cincinnati and at St. Louis, which was done at St. Louis by shipping on the Joe Kinney; but there is no allegation that the Kinney was negligently or unskillfully navigated. The allegation is that the Kinney "was old and unseaworthy in this: that her tiller-rope was old and worn, and 'was carelessly, negligently, and improperly allowed so to remain; insomuch that, .without unusual external cause co-operating, it was broken by the ordinary turning of the pilot-wheel in guiding said steamer under the bridge at Glasgow, whereby said steamer became unmanageable, and, striking the pier of the bridge, sank, and thus caused the total loss of said merchandise."

The libelant has taken no evidence upon this allegation resting upon the presumption which he is insisting arises from the fact that the tiller-rope did in fact break, and the boat and cargo were lost. The respondent has taken the depositions of all of the officers on the Kinney except the captain, who is now living in the city of Mexico, and several witnesses not on the boat, who prove the repairs done the Kinney just before she started on this trip.

This testimony shows that the Kinney had been on the docks some two weeks, and had been overhauled and repainted, and was generally in excellent condition. The tiller-rope was handled and examined. It was taken out, and greased and oiled, and then replaced, and no defect or weakness was discovered in it. It was not a new tiller-rope, nor is it shown how long it had been in service. There is nothing in the record tending to show that it was defective, either in size or strength, except the fact that it broke when put to the test under the bridge. This was a severe test, but not an extraordinary one. The pilot testifies that his wheel felt, at the time of the parting of the tiller-rope, as if the rudder had struck drift in the river. There is also proof that the river was rising rapidly and much drift in it, and that the piers had caused cross currents in the river.

Several of the officers of the boat testify that the tiller-rope would have been of no use at the time of the accident, as the boat was backing on both wheels, and that that was the only thing which could be done, and hence the parting of the tiller-rope made no difference in the result. If these opinions are correct, the sinking of the boat and cargo would have been unavoidable, even if the tiller-rope had not parted. There are no opposing opinions to this view taken by the libelant, but I must think these opinions are extreme ones, and not correct to the extent stated, since the rudder must have been of some use in getting to shore after the boat struck, if of no use in avoiding the pier which was struck.

It would not, however, do for me to ignore all of the evidence introduced by the defendant which tends to show that caution and care

were taken in overhauling and repairing this boat, and that the tiller-rope was taken out, examined, and oiled, without the discovery of any defect, and make the Morning Mail liable for the value of these goods, etc., because, and only because, the tiller-rope in fact broke, especially as the evidence shows this is not an unusual occurrence in the Missouri river.

The evidence, I think, proves that the sinking of the Kinney was caused by the "unavoidable dangers of navigation," within the meaning of the bill of lading.

The libel will be dismissed.